STEPHENS, Judge.
Respondent-mother appeals from the district court's permanency planning order awarding guardianship of the juvenile "Ava"[1] to family friends, Mr. and Mrs. P. Respondent-mother contends the evidence did not support ceasing reunification efforts with her and that the court's visitation order was arbitrary. We affirm.
Ava was born in July 2011. Respondent-mother had been diagnosed with schizophrenia, depression, bipolar disorder, paranoia, and mild mental retardation, and hospital staff was immediately concerned about Respondent-mother's mental health and her ability to care for Ava. Respondent-mother and Ava's father, who had also been diagnosed with schizophrenia, voluntarily placed Ava with family friends Mr. and Mrs. P. Respondent-mother admitted that she had threatened to kill herself and pulled a knife on the father in two separate incidents later that month. Respondent-mother was committed to a mental health care facility and prescribed medication to treat schizoaffective disorder and chronic mental illness, and was discharged on or about 8 August 2011. On 10 August 2011, Respondent-mother visited the Onslow County Department of Social Services ("DSS") and became upset when she learned Ava could not be returned to her custody at that time.
On 22 August 2011, DSS filed a petition alleging Ava was neglected in that she lived in an environment injurious to her welfare. Between September and December 2011, counsel for Respondent-mother and the father each sought copies of various documents in the DSS file on Ava, necessitating several continuances of the matter. On 22 February 2012, the court entered an order directing DSS to provide the requested documents and setting adjudication for April 2012. On 29 March 2012, Respondent-mother filed a motion for DSS to show cause why it should not be held in contempt for the willful violation of the 22 February order. The record on appeal does not contain any information about the court's ruling on the motion to show cause, but, on 20 April 2012, the court entered an order continuing the matter until July 2012. Throughout this period, Ava remained in the placement with Mr. and Mrs. P, who supervised visits between Respondent-mother and Ava three times per week in addition to the hour of visitation supervised by DSS every other week.
The case was finally heard on 11 July 2012. Respondent-mother and the father agreed to permit DSS to amend the petition to strike the allegation of neglect and add an allegation of dependency, and did not contest the dependency allegation at the adjudication hearing. The district court entered an order adjudicating Ava dependent on 17 May 2013.[2] The court ordered Respondent-mother to follow through with all mental health recommendations, including individual counseling, medication therapy, and family and marital therapy. The court also continued the visitation schedule of one hour every other week supervised by DSS and a total of five hours over three days per week supervised by Mr. and Mrs. P.
In a permanency planning order entered 6 February 2014, the district court found that Respondent-mother had encountered domestic violence in her current relationship, with a man other than Ava's father, and had cancelled several appointments, including two which were part of a parenting capacity evaluation ordered by the court. The court also found that Respondent-mother had not been taking advantage of the visitation opportunities provided by Mr. and Mrs. P. Accordingly, the court concluded that it was not in Ava's best interest to return to Respondent-mother's care, although the permanent plan remained reunification with Respondent-mother. The court provided that Respondent-mother would have visitation for one hour every other week supervised by DSS.
Respondent-mother refused to allow a social worker into her home in May 2014, and DSS received a report that Respondent-mother had reunited with Ava's father later that month. Respondent-mother denied that she and the father were living together. The matter came on for a second permanency planning hearing on 28 and 31 July 2014. After hearing the evidence, the district court ordered DSS to cease reunification efforts with Respondent-mother, changed Ava's permanent plan to guardianship with Mr. and Mrs. P, and appointed Mr. and Mrs. P as Ava's guardians. From that order, Respondent-mother appeals.
I. Reasonable efforts at reunification
Respondent-mother first argues that the evidence does not support the district court's finding of fact that DSS made reasonable efforts to implement the plan to reunify Ava with Respondent-mother. We disagree.
At any permanency planning hearing where the juvenile is not placed with a parent, the court shall additionally consider .... [w]hether the county department of social services has since the initial permanency plan hearing made reasonable efforts to implement the permanent plan for the juvenile.
N.C. Gen.Stat. § 7B-906.1(e)(5) (2013). Under our Juvenile Code, "[r]easonable efforts" means "[t]he diligent use of preventive or reunification services by a department of social services when a juvenile's remaining at home or returning home is consistent with achieving a safe, permanent home for the juvenile within a reasonable period of time...." N.C. Gen.Stat. § 7B-101(18) (2013).
In finding of fact 13, the district court identified the following actions as reasonable efforts made by DSS to effectuate the permanent plan of reunification:
conducting monthly home visits to [Respondent-]mother's home, making a referral for [R]espondent[-]mother on February 27, 2013 to the Onslow County Woman's Center to address issues of domestic violence, ... [past] referrals for [Respondent-mother] to participate in ACTT intensive therapeutic services which was terminated because of [Respondent-mother]'s lack of attendance [,] ... referrals for the completion of a parental capacity examination [,] ... transportation services for [R]espondent[-]mother to attend the appointment and to obtain prescription medication[,] ... refer[rals] to CSSA parenting education services[, and] to mental health providers....
Respondent-mother contends that several portions of this finding are not supported by the evidence. For example, Respondent-mother contends that, although a social worker supervisor at DSS testified that social workers had made visits to Respondent-mother's home, no evidence suggested the visits occurred every month and the most recent visit appeared to have been on 28 February 2013. While we agree that nothing in the record before this Court suggests that social workers made a home visit everymonth following the initial permanency planning hearing, a "Court Report for Permanency Planning Hearings" ("court report") dated 27 June 2012 indicates that social workers "made several visits" to Respondent-mother's home between 6 July 2011 and 24 April 2012 and made three visits to her home in May and June 2012. A court report dated 20 May 2013 states that social workers made a "[m]onthly visit" to Respondent-mother on 28 February 2013, which suggests that monthly visits had been ongoing since the previous court report in June 2012. A court report dated 18 July 2014 indicates that a social worker attempted to arrange a home visit on 14 March 2013, but Respondent-mother said she was sick and then turned off her phone. The same court report states that Respondent-mother relocated at least six times between September 2013 and March 2014 and that Respondent-mother refused to allow a social worker into her home on 1 May 2014.
This evidence indicates ongoing efforts to have regular home visits with Respondent-mother and her refusal to cooperate with those efforts. In any event, Respondent-mother does not cite any authority that monthly home visits are required to establish "reasonable efforts" by DSS. Likewise, while we agree with Respondent-mother's assertion that DSS did not "attempt to have Ava placed in the home or even visit the home[,]" we note that such efforts were not appropriate here, much less required to establish reasonable efforts. SeeN.C. Gen.Stat. § 7B-906.1(e)(5).
Respondent-mother also notes that she was referred to the mental health services program "ACTT" by another mental health program known as "PRIDE," rather than by DSS directly. However, DSS referred Respondent-mother to PRIDE, and her subsequent referral by PRIDE to ACTT was due to Respondent-mother's lack of progress in PRIDE. To the extent the court's finding is unclear on this point, we fail to see how it impacts the district court's analysis of DSS's reasonable efforts.
Indeed, the substance of Respondent-mother's appellate argument on this issue is that DSS should have undertaken different and more extensive efforts to achieve reunification. Respondent-mother asserts that, rather than making reasonable efforts at reunification, DSS actively sought to sabotage Respondent-mother's efforts to regain custody of Ava. For example, Respondent-mother notes that she was assigned to seven different social workers over the three years since Ava's birth and that DSS did not implement all of the recommendations suggested by Jennifer Sapia, Ph.D., the psychologist who performed the evaluation of Respondent-mother's parental capacity.
Regarding the number of social workers assigned to her case, Respondent-mother asserts this turnover caused DSS to be slow in getting Dr. Sapia the records and information Dr. Sapia needed to conduct her parental capacity evaluation, resulting in a delay in the completion of the evaluation. Respondent-mother characterizes the delay as almost two years. The record reveals that Respondent-mother was referred to Dr. Sapia on 14 March 2013, and that Dr. Sapia received the necessary final psychological records on 12 March 2014 and completed the evaluation in early May 2014. Dr. Sapia noted in her correspondence with DSS that she had experienced delays and difficulty in obtaining the materials she requested from DSS as part of the evaluation process. However, Dr. Sapia also states that, after Respondent-mother's initial appointment with Dr. Sapia, Respondent-mother did not show up for two subsequent appointments. Respondent-mother also suggests that having different social workers prevented DSS from coordinating appropriate mental health treatment for her. However, the record before this Court is replete with evidence regarding failure by Respondent-mother to attend scheduled mental health appointments, to make progress in the programs she did attend, to maintain her medication schedule, and to appreciate her mental health issues and their impact on her ability to manage her own needs. We are not persuaded that all, or even most, of these issues would have been avoided simply by having a single social worker assigned to Respondent-mother's case. Further, while we agree that more consistency in Respondent-mother's social work team would have been ideal, no caselaw suggests that such turnover requires the district court to conclude that DSS failed to make reasonable efforts to reunite Ava and Respondent-mother.
As for the parental capacity evaluation ordered by the district court in October 2012, Respondent-mother states that mental health professionals had previously found that she was able to care for Ava. It is true that one of Respondent-mother's mental health providers opined that "there was no psychological data from [her] evaluation to indicate that she was not able to care for [Ava]." However, we observe that this opinion came in a letter from a provider at Coastal Carolina Neuropsychological Center dated 21 July 2011 ("the July 2011 letter"), two days before Respondent-mother threatened to kill herself with a knife, six days before she attacked Ava's father with a knife, and eight days before Respondent-mother committed herself to Duplin County General Hospital Psychiatric Care. In light of those events and Respondent-mother's previously diagnosed cognitive deficits and history of mental illness, a parental capacity evaluation of Respondent-mother would appear highly appropriate.
After conducting the evaluation, Dr. Sapia reported that, with "intensive supports, [Respondent-mother] may be able to play a much more active parenting role." However, Dr. Sapia did not specify what type of "intensive supports" Respondent-mother would need in order to adequately parent Ava or for how long such supports might be required. Dr. Sapia's report noted that Respondent-mother demonstrated a very "simplistic understanding of parenting responsibilities[,]" making statements such as, "I basically know everything [about parenting]" and "my parenting is wonderful." Dr. Sapia also noted that Respondent-mother had difficulty in consistently meeting her own self-care needs. For example, Dr. Sapia documented Respondent-mother's admitted history of medication noncompliance and hanging up on a nurse who attempted to follow up with her, as well as failure to make and keep medication-related medical appointments. She also told Dr. Sapia that she did not actually have bipolar disorder, paranoia, or mental retardation, despite those diagnoses and assessments having been made by mental health professionals. Respondent-mother insisted the July 2011 letter proved she was a competent parent who could care for Ava and that, further, "my attorney says I'm a competent parent and there's nothing wrong with me." As a result of this lack of insight into or understanding of her cognitive, mental health, and parenting support needs, Dr. Sapia expressed "significant concerns about [Respondent-mother's] ability to independently and adequately care for her child." We are sympathetic to Respondent-mother's circumstances, but again observe that our General Assembly has elected to require social service agencies to undertake reasonable, rather than exhaustive or "intensive," efforts in order to effectuate a plan of reunification with a parent.
In sum, the evidence here supports the finding of fact that DSS undertook reasonable efforts to implement the permanent plan of reunification of Ava with Respondent-mother by offering Respondent-mother transportation; making referrals for mental health, parenting, and domestic violence services; facilitating supervised visits with Ava; and attempting to conduct regular home visits with Respondent-mother. See, e.g., In re Rholetter,162 N.C.App. 653, 662, 592 S.E.2d 237, 243 (2004) (finding reasonable efforts where the agency provided "family services case plans with respondent 'outlining what needs to be accomplished,' provided supervised visits between respondent and the juveniles, and provided family counseling to the parties involved in addition to other services"). This argument is overruled.
II. Futility of continued efforts at reunification
Respondent-mother next argues that the district court erred in concluding that Ava's return to Respondent-mother's custody in the next six months was unlikely and that it would be futile to continue efforts at reunification. We disagree.
At a permanency planning hearing, the district court shall consider certain criteria and make written findings about those that are relevant, including, inter alia,
(1) Services which have been offered to reunite the juvenile with either parent whether or not the juvenile resided with the parent at the time of removal or the guardian or custodian from whom the child was removed.
(2) Reports on visitation that has occurred and whether there is a need to create, modify, or enforce an appropriate visitation plan in accordance with [section] 7B-905.1 [and]
(3) Whether efforts to reunite the juvenile with either parent clearly would be futile or inconsistent with the juvenile's safety and need for a safe, permanent home within a reasonable period of time. The court shall consider efforts to reunite regardless of whether the juvenile resided with the parent, guardian, or custodian at the time of removal. If the court determines efforts would be futile or inconsistent, the court shall consider a permanent plan of care for the juvenile.
....
N.C. Gen.Stat. § 7B-906.1(d). "In a permanency planning hearing held pursuant to Chapter 7B, the [district] court can only order the cessation of reunification efforts when it finds facts based upon credible evidence presented at the hearing that support its conclusion of law to cease reunification efforts." In re Weiler,158 N.C.App. 473, 477, 581 S.E.2d 134, 137 (2003) (citation omitted) (decided under prior statutes).[3]
Respondent-mother contends the evidence from the hearing shows that she was not given a sufficient opportunity to make progress toward reunification. We are not persuaded. To the contrary, the evidence fully supports the court's findings of fact regarding Respondent-mother's ongoing difficulties and insufficient response to DSS's efforts to help her address them. For example, the court reports discussed supra,which were admitted into evidence at the hearing without objection, detail Respondent-mother's history of mental health problems and mixed treatment history, history of domestic violence and inability to separate from her abusers, and resistance to DSS's attempts to provide services. In addition, the reports from Dr. Sapia provided a detailed description of Respondent-mother's cognitive deficits and mental health problems, her lack of insight into her impaired parenting skills, her inability to understand and manage her own self-care needs, and her difficulty in maintaining a stable home and relationships, among other significant impediments to becoming a safe and appropriate caretaker for Ava.
Based upon this evidence, inter alia,the court made the following findings of fact regarding cessation of reunification efforts with Respondent-mother:
7. Pursuant to [section] 7B-507(b)(1), this [c]ourt finds that reunification efforts should cease with [Respondent-mother] as such efforts clearly would be futile and would be inconsistent with the juvenile's health, safety, and need for a safe, permanent home within a reasonable period of time as stated in findings of fact 6 and as hereby adopted in this finding as well.[4]
8. Pursuant to [section] 7B-906.1(e)(2) [,] it is unlikely that the juvenile can be returned to her parents within six months as found in finding [ ] number 6 and as hereby adopted in this finding as well....
In finding of fact six, the court described Respondent-mother's (1) "long and significant history" of mental health problems, (2) failure to consistently treat those problems despite DSS intervention, (3) refusal to give consent for the release of some of her psychological records, (4) past hospitalization and overdose, (5) extensive history with domestic violence and difficulty with separating herself from her abusers, and (6) low IQ and cognitive difficulties. The court also noted the impact of these issues on Respondent-mother's ability to care for herself. These findings of fact are sufficient to support the district court's determination to cease reunification efforts. See In re T.R.M.,188 N.C.App. 773, 656 S.E.2d 626 (2008) (decided under the prior statutes discussed in footnote 3). Accordingly, we overrule this argument. Based on this evidence, the district court properly ordered DSS to cease reunification efforts with Respondent-mother.
III. Visitation plan
Respondent-mother also argues the district court abused its discretion by failing to order visitation schedules that sufficiently differentiated between herself and Ava's father. We disagree.
"An order that removes custody of a juvenile from a parent, guardian, or custodian or that continues the juvenile's placement outside the home shall provide for appropriate visitation as may be in the best interests of the juvenile consistent with the juvenile's health and safety." N.C. Gen.Stat. § 7B-905.1(a) (2013). "If the juvenile is placed or continued in the custody or guardianship of a relative or other suitable person, any order providing for visitation shall specify the minimum frequency and length of the visits and whether the visits shall be supervised. The court may authorize additional visitation as agreed upon by the respondent and custodian or guardian." N.C. Gen.Stat. § 7B-905.1(c).
We review "dispositional orders of visitation for an abuse of discretion." In re C.M.,183 N.C.App. 207, 215, 644 S.E.2d 588, 595 (2007) (citation omitted). "Abuse of discretion exists when the challenged actions are manifestly unsupported by reason." In re S.R.,207 N.C.App. 102, 110, 698 S.E.2d 535, 541 (citation and internal quotation marks omitted), disc. review denied,364 N.C. 620, 705 S.E.2d 371 (2010).
In this case, the court's finding regarding visitation refutes Respondent-mother's argument that it failed to consider her relationship with Ava, as compared to the father's, when it formulated a visitation plan:
12. The Court finds that there exists a bond between mother and child and that the mother visits consistently. It is important for that bond to continue [;] therefore the court further finds that pursuant to [section] 7B-905.1 [ ] the appropriate visitation plan for the respondent parents should be two hours a month supervised every other week to include extra visits as [Mr. and Mrs. P] can accommodate. [R]espondent[-]mother should also be allowed to have telephonic communication with her child twice a week Mondays and Thursdays from 7:00 pm to 7:30 pm. Further, the parties understand that any party may motion this [c]ourt after proper notice, for modification or enforcement to this visitation schedule....
Contrary to Respondent-mother's assertions, this finding demonstrates that the court considered her bond with Ava and the importance of preserving that bond, and permitted her additional communication with Ava via twice-weekly telephone calls to achieve that end. Although we agree with Respondent-mother that telephone calls to a three-year-old child may not be the most meaningful additional contact, our review is for an abuse of discretion only. As Dr. Sapia noted in her reports, Ava is at a developmental stage when consistency is crucial for appropriate bonding and when the avoidance of "abrupt" changes in her relationships with caretakers is desirable. In light of this observation, we conclude that Respondent-mother has failed to demonstrate an abuse of discretion by the district court in providing her with additional, albeit limited, contact with Ava.[5] Accordingly, the district court's permanency planning order is
AFFIRMED.
Chief Judge MCGEE and Judge DAVIS concur.
Report per Rule 30(e).
Opinion
Appeal by Respondent-mother from order entered 15 September 2014 by Judge Sarah C. Seaton in Onslow County District Court. Heard in the Court of Appeals 26 May 2015.

The parties have stipulated to use of the pseudonym "Ava" for the juvenile A.E. to protect the identity of the minor child and for ease of reading. See N.C.R.App. P. 3.1(b). For the same reasons, we refer to the couple awarded guardianship of Ava by the initial of their surname.

Nothing in the record before this Court explains the ten-month delay between the adjudication hearing and entry of the order.

The General Assembly recently merged the provisions regarding custody review hearings from former N.C. Gen.Stat. § 7B-906 and permanency planning hearings from former N.C. Gen.Stat. § 7B907 into section 7B-906.1. Session Laws 2013-129, s. 41, made section 7B-906.1 effective 1 October 2013 and applicable to actions filed or pending on or after that date. The combination of the two former statutes did not involve significant substantive changes pertinent to this appeal.

We note that, although the district court cited [section] 7B-507(b)(1) in this finding of fact, that section is only relevant to orders "placing a juvenile in the custody or placement responsibility of a county department of social services[.]" N.C. Gen.Stat. § 7B-507(b) (2013). Because this order placed Ava in a guardianship rather than with DSS, the relevant statute is N.C. Gen.Stat. § 7B-906.1(d)(3). The substance of the finding, however, is unaffected by the reference to the wrong statute, because both sections require the court to consider whether further efforts toward reunification "would be futile or would be inconsistent with the juvenile's health, safety, and need for a safe, permanent home within a reasonable time." N.C. Gen.Stat. § 7B-507(b)(1) (2011) ; see also N.C. Gen.Stat. § 7B-906.1(d)(3).

As the court found, Respondent-mother may seek a modification of the visitation plan, and, if Respondent-mother did so, the court may determine that additional in-person contact would be appropriate and in Ava's best interest at some future point in time.